Filed 12/27/24  P. v. Valenzuela CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARK ANTHONY VALENZUELA,<br><br>    Defendant and Appellant. | H050501<br>(Monterey County<br>Super. Ct. No. 18CR004827) |

In 2019, defendant Mark Anthony Valenzuela pleaded no contest to one count of non-premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and admitted that the attempted murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The trial court sentenced Valenzuela to a stipulated total term of 17 years in state prison.  Valenzuela now appeals the denial of his petition for resentencing under former section 1170.95 (Stats. 2018, ch. 1015, § 4).[2]

For the reasons discussed below, we will reverse the order and remand for resentencing.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. Charges, plea, and sentencing

On August 8, 2019, the Monterey County District Attorney filed a first amended information charging Valenzuela and a codefendant, Miguel Jimenez, with two counts of willful, deliberate, and premeditated attempted murder (§§ 664, 187, subd. (a); counts 1 and 2); two counts of assault with a

---

[1] Unspecified statutory references are to the Penal Code.

[2] Section 1170.95 has been amended and renumbered as section 1172.6.  (Stats. 2022, ch. 58, § 10, eff. June 30, 2022; see also Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.)  We will henceforth refer only to section 1172.6.

semi-automatic firearm (§ 245, subd. (b); counts 3 and 4); street terrorism (§ 186.22, subd. (a); count 5); and assault with a deadly weapon (§ 245, subd. (a)(1); count 6). The information further alleged gang enhancements (§ 186.22, subd. (b)(1)) in connection with counts 1, 2, 3, and 4.

That same day, Valenzuela pleaded no contest to count 1, the attempted murder of John Doe (without premeditation), (§§ 187, subd. (a), 664) and admitted the special allegation that he committed that offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). In the plea waiver form, Valenzuela agreed that the preliminary hearing transcript provided a factual basis for the conviction.

In accord with the plea agreement, the trial court imposed an aggregate sentence of 17 years in state prison, consisting of the middle term of seven years on count 1 plus a consecutive term of 10 years on the gang enhancement. The court granted the prosecution's motion to dismiss the remaining counts and special allegations.

### B. Petition for resentencing

On March 23, 2022, Valenzuela petitioned for resentencing pursuant to section 1172.6, declaring that he could not presently be convicted of attempted murder. The trial court concluded that Valenzuela's petition stated a prima facie case of relief and set an evidentiary hearing which was held on October 5, 2022.

### C. Evidentiary hearing

We recount the testimony and evidence presented during the evidentiary hearing, at which the court also considered non-hearsay portions of testimony presented at the preliminary hearing.

#### 1. The shooting and surveillance video evidence

On April 7, 2018, siblings John and Jane Doe were standing outside their mother's house in Salinas when two young men walked toward them. When the two men were between 7 to 20 feet

away,[3] the men pulled out guns and began firing at the Does. The Does ran to the back of the house and escaped unharmed.[4]

Surveillance video recorded the shooting as well as the arrival and departure of the vehicle carrying the assailants. A witness testified that she saw a white car, without a license plate, park on the street by her house just before the shooting. There were three people in the car and the witness saw one[5] young man get out of the vehicle and walk away. A few seconds later, the witness heard gunshots, then saw the same young man run back and get in the car which then drove away.[6]

The prosecution also presented testimony and surveillance video showing how, prior to the shooting, Valenzuela circled the neighborhood for several minutes before parking near the scene. After the shooters ran back to the car, the video shows Valenzuela driving away and running a stop sign.

### 2. Encounter with police shortly after the shooting

City of Salinas Police Officer Robert Hernandez was responding to the report of gunshots when he "learned that the suspect vehicle was a white sedan occupied by three or four Hispanic males." Hernandez observed a white Nissan Altima "occupied by three Hispanic males" drive past him in the opposite direction. Hernandez saw that the vehicle "had black dealer plates, [but] no [license] plates" and made a U-turn to pull the car over. As he did so, Hernandez saw the Nissan driving on the wrong side of the road, and he accelerated to try and catch up to it. As he passed a cul-de-sac at a high rate of speed, Hernandez saw that the vehicle was parked at the end of that cul-de-sac. Hernandez made another U-turn and the Nissan exited the cul-de-sac and sped away, reaching approximately 70 miles

---

[3] John Doe testified the men were approximately 20 feet away when they started shooting, but Jane Doe testified the distance was seven to eight feet. In all, the men fired a total of 14 shots at the Does.

[4] Police found bullet holes in John Doe's car as well as in a small "shack" behind his mother's house.

[5] The witness testified only one man got out of the car, though there is no dispute that there were two shooters both of whom are shown on the video approaching the victims, firing multiple times, then running off together.

[6] No witness, including the victims, testified that the shooters called out any gang slogans or otherwise indicated that they were Norteño gang members at any time.

3

per hour in an effort to evade him. Eventually, Hernandez was able to pull the vehicle over. Valenzuela was driving the car, with Jimenez and another passenger[7] inside. Although the Nissan had paper dealer plates, Hernandez saw that its license plate was in the glove compartment. The car was registered to Valenzuela.

In a records check, Hernandez learned that Valenzuela was on probation out of Merced County, but neither Jimenez nor the other passenger[8] were on probation or had outstanding warrants. Hernandez asked if he could search the vehicle, but Valenzuela refused. During the course of the stop, Hernandez was informed that a witness at the scene of the shooting had described the suspect vehicle as a white Honda. Hernandez did not believe he had probable cause to search the car, so he cited Valenzuela for various traffic infractions and let him go.

### 3. Gang expert testimony

The parties stipulated that Detective Robert Miller would testify as an expert in criminal street gangs and further stipulated that Norteños "are an ongoing street gang that engages in a pattern of criminal activity" under applicable California law at the time of the preliminary hearing. Miller testified that, in his opinion, Valenzuela and Jimenez were active Norteño gang members and that "taking out a rival gang member [] makes the Norteño gang stronger." The district attorney presented Miller with the following hypothetical: "Three Norteños, Norteño l, Norteño 2, Norteño 3, they drive to a residence where two Sureño associates are standing outside. Norteño 3 and Norteño 2 get out of the car while Norteño l, the driver, waits. [¶] Norteño[s] 2 and 3 approach the Sureño associates and both open fire on the Sureño associates. They then return to Norteño 1's vehicle, and Norteño l drives them away." Based on that hypothetical, Miller stated that it was his opinion that the shooting "was committed for the benefit of the [Norteño] gang." Miller further testified that a gang member who enters rival gang territory and commits a shooting "instills fear in the public and intimidates the public and the other gang members."

---

[7] That passenger provided a false name to Hernandez, but Hernandez did not learn the passenger's true identity until some months later.

[8] The passenger who had provided the false name was in fact on juvenile probation at the time of the stop, with both search-and-seizure waivers and gang conditions.

4

Miller testified that he was familiar with John Doe and believed he was a Sureño gang member, "based on the totality of everything" including John Doe's "own admission."[9] According to Miller, the neighborhood where the shooting took place was a "Sureño gang area," though he could not say it was under Sureño control.

### 4. Valenzuela's arrest

A few weeks after the shooting, police arrested Valenzuela in the course of a traffic stop. Valenzuela was driving the same white Nissan that was depicted in the surveillance videos gathered in investigating the shooting.

### D. Trial court's ruling

At the conclusion of the evidentiary hearing, the trial court found the district attorney had met its burden of proving beyond a reasonable doubt that Valenzuela "shared the intent of the perpetrators to commit either an attempted murder or a murder."

Valenzuela timely appealed.

## II. DISCUSSION

Valenzuela argues that the trial court erred in concluding that the evidence presented at his resentencing hearing was sufficient to prove beyond a reasonable doubt that he could be found guilty of attempted murder. We agree.

### A. There is insufficient evidence to support trial court's finding that Valenzuela could be guilty of attempted murder

#### 1. Legal Principles

##### a. Senate Bill No. 1437's amendments to the law of murder

"Senate Bill [No.] 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842.) First, as amended by Senate Bill No. 1437,

---

[9] Miller did not know if Jane Doe had any "active Sureño gang affiliation."

section 188, subdivision (a)(3) was added to require that "in order to be convicted of murder, a principal in a crime shall act with malice aforethought." (§ 188, subd. (a)(3).) Second, Senate Bill No. 1437 added section 189, subdivision (e), limiting liability for felony murder. (Stats. 2018, ch. 1015, § 3.) Third, Senate Bill No. 1437 "created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

### b. Senate Bill No. 775 permits resentencing on attempted murder convictions

In October 2021, the Governor signed Senate Bill No. 775 (Stats. 2021, ch. 551, § 2), effective January 1, 2022, which amended section 1172.6 to clarify that persons who were convicted of attempted murder under the natural and probable consequences theory " 'are permitted the same relief as those persons convicted of murder under the same theor[y].' " (*People v. Patton* (2023) 89 Cal.App.5th 649, 656 (*Patton*).)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*); see also *People v. Scott* (1997) 15 Cal.4th 1188, 1213.) An intent to kill is shown if the assailant either desires the death of the victim or knows to a substantial certainty that death will occur as the result of the assailant's action. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "[I]ntent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.) Although the lack of a motive for an attempted murder is not dispositive, "where motive is shown, such evidence will usually be probative of proof of intent to kill." (*Id.* at p. 742.)

Section 1172.6 "applies by its terms only to attempted murders based on the natural and probable consequences doctrine." (*People v. Coley* (2022) 77 Cal.App.5th 539, 548 (*Coley*).) When a defendant is "found guilty of attempted murder under a natural and probable consequences theory of liability, the 'intent to kill' [is] imputed onto [the defendant] from the actual killer or perpetrator." (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1007.) "Because section 188, subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable

6

consequences doctrine cannot prove an accomplice committed attempted murder. Accordingly, the natural and probable consequences doctrine theory . . . is now invalid." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

Although a defendant can no longer be held liable for attempted murder based on the natural and probable consequences doctrine, under current law, a "sole and actual perpetrator of the attempted murder . . . is ineligible for resentencing as a matter of law." (*Patton, supra*, 89 Cal.App.5th at p. 657.) Additionally, "[d]irect aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775." (*Coley, supra*, 77 Cal.App.5th at p. 548.) "To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' [Citations.] In addition, . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee, supra*, 31 Cal.4th at pp. 623–624; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).)

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) The test is "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or

7

encouraged him by words or gestures." (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208; *People v. Smith* (1998) 64 Cal.App.4th 1458, 1469 [intent is generally proved by the act and surrounding circumstances].)

### c. Resentencing procedure under section 1172.6

When the trial court receives a petition under section 1172.6 requesting vacatur of a murder, attempted murder, or manslaughter conviction and resentencing, and "containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' [Citation.]" (*Strong*, *supra*, 13 Cal.5th at p. 708, citing *People v. Lewis* (2021) 11 Cal.5th 952 970–972, § 1172.6, subd. (c).)

On appeal from an order denying a section 1172.6 petition after an evidentiary hearing, we review the trial court's fact finding for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); *People v. Williams* (2020) 57 Cal.App.5th 652, 663.) We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicholas* (2004) 34 Cal.4th 614, 657–658.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) "A reversal for insufficient evidence 'is unwarranted unless it

8

appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' " the trier of fact's determination. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

We must presume on appeal "the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*People v. Clark* (2016) 63 Cal.4th 522, 610.) But " '[a] reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork; a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence.' " (*People v. Grant* (2020) 57 Cal.App.5th 323, 330.)

### 2. Analysis

In this case, there is no *direct* evidence of Valenzuela's intent prior to or during the shooting itself. The Attorney General contends that, nonetheless, there was substantial circumstantial evidence to support the trial court's finding that Valenzuela was guilty of attempted murder as an aider and abettor. Specifically, the Attorney General points to Miller's expert gang testimony as demonstrating Valenzuela's motive to kill rival gang members, as well as his conduct before, during, and after the shooting. As discussed below, we disagree that this evidence is sufficient to support a determination that Valenzuela shared an intent to kill.

### a. No substantial evidence to prove Valenzuela shared intent to kill

The main evidence presented at the hearing to prove attempted murder consisted of the following: Valenzuela drove Jiminez and another young man into a "Sureño gang area"[10] where they circled the neighborhood at least once before Valenzuela pulled over. At some unknown point in time beforehand, Valenzuela replaced his license plate with a dealer plate. According to the gang expert Miller, Valenzuela and Jiminez were Norteño gang members and Norteño gang members will try to kill Sureño gang members or commit shootings in Sureño gang territory to intimidate rival gang members and the public. Valenzuela remained in the car while Jiminez and the other passenger exited the

---

[10] When asked if the neighborhood was "controlled by the Sureños," Miller replied that he "wouldn't say it's controlled by [Sureños]." Miller was not asked to explain the difference, if any, between a neighborhood that is considered a gang "area" versus a neighborhood that is considered to be under the "control" of a gang.

vehicle and approached the victims on foot before pulling out their guns and shooting at them multiple times. The victims, neither of whom were hit, were standing in front of a car in the carport. However, several of the bullets struck the hood and windshield of that car, supporting a conclusion that the shooters intended to kill the victims. The shooters then ran back to Valenzuela's car and all three men drove away, with Valenzuela driving.

It is undisputed that Valenzuela was not a direct perpetrator and thus could only be convicted of attempted murder as an aider and abettor. " 'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' [Citation.] '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' [Citation.]" (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.)

In this case, there is no direct evidence to show that Valenzuela *knew* that Jiminez and the other man intended to try and kill the victims (or anyone else) that day and that he *shared* in that intent. (*McCoy, supra,* 25 Cal.4th at p. 1118 ["the aider and abettor must know and share the murderous intent of the actual perpetrator."].) For example, there is no evidence (direct or circumstantial) that Valenzuela knew that either of his passengers had a firearm that day.[11] The witness evidence established the shooters pulled out their weapons *after* they left the car and *just before* they opened fire

_____

[11] Miller's testimony regarding gangs and firearms consisted of the following: "Firearms are kind of a tool of the trade for gang members. They're used offensively and defensively. Offensively if they happen to see a rival gang member, they have an opportunity to shoot that gang member *if they have a gun*. And defensively to protect themselves against rival gang members. They also use the guns for committing robberies and other type of crimes." (Italics added.) Again, while Miller's testimony supports a conclusion that gang members will shoot a rival gang member "they happen to see," such a shooting will only take place *if* the gang member has a firearm. Miller did not testify that gang members are always armed with firearms or that firearms are used exclusively to shoot rival gang members.

on the Does. However, there was no evidence Valenzuela had seen either of his passengers in possession of a firearm at any time prior to the shooting. While there is some circumstantial evidence that Valenzuela knew his passengers intended to engage the Does in some capacity, that evidence is not sufficient to demonstrate that Valenzuela shared their intent to kill the Does and was thereby guilty of aiding and abetting attempted murder.

### b. Motive evidence

Notwithstanding the lack of direct evidence of an intent to kill, the Attorney General appears to argue that Valenzuela and his passengers' status as Norteño gang members provided a motive and was circumstantial evidence of his intent to kill. Specifically, the Attorney General notes that gang expert Miller testified that Norteño gang members sought to kill rival gang members, especially Sureño gang members, because doing so bolstered the reputation of the Norteño gang. In addition, the Norteño gang's reputation is further enhanced when the killing takes place in the rival gang's territory.

While a gang expert may not offer an opinion on the defendant's state of mind or whether he committed the crime (*People v. Vang* (2011) 52 Cal.4th 1038, 1047–1048), "[t]he People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Expert opinion is ordinarily admissible for such purposes if "guided by hypothetical questions . . . ' "rooted in facts shown by the evidence." ' " (*People v. Renteria* (2022) 13 Cal.5th 951, 967.)

However, " '[g]ang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.' [Citation.] With exceptions not applicable here, 'evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.' (Evid. Code, § 1101, subd. (a).) 'Evidence of gang

11

membership may not be introduced . . . to prove intent or culpability. [Citations.]' (*Kennedy v. Lockyer* (9th Cir. 2004) 379 F.3d 1041, 1055.)" (*People v. Memory* (2010) 182 Cal.App.4th 835, 859.)

Although the Attorney General argues that Miller's gang testimony demonstrates Valenzuela's motive and intent to commit murder, the testimony still presupposes that Valenzuela knew, *on this specific occasion*, that his passengers were armed with firearms and intended to shoot at any Sureño gang members they encountered as they drove. Miller's testimony did not and could not establish that Valenzuela, just because he is a Norteño, had an unvarying criminal disposition to attack Sureños with deadly force on every occasion in which his fellow gang members acted with an intent to kill.

The dissent relies on *Nguyen*, *supra*, 61 Cal.4th 1015 to bolster its conclusion that "substantial evidence supports the trial court's ruling in the case before us." (Dissent, p. 4) We think *Nguyen* is distinguishable. In *Nguyen*, the gang expert testified that "at the time of the shooting, the Nip Family and the Cheap Boys were in a state of war, and members of both gangs were expected to be able to engage in gunfights with their rivals 'at a moment's notice.' " (*Id*. at p. 1054.) Here, gang expert Miller testified in general terms about the ongoing rivalry between Norteño and Sureño gangs, saying that they "feud often" which "*usually* result[s] in shootings." (Italics added.) Unlike the gang expert in *Nguyen*, Miller did *not* testify that the Norteño and Sureño gangs in Salinas were *currently* at war, nor did he testify that Valenzuela's subset, Santa Rita Bahamas, was at war with or actively feuding with any particular Sureño subset, let alone the Sureño subset to which John Doe belonged. In addition, the defendant in *Nguyen* was observed "star[ing] back at the occupants of [the victim]'s car as one car passed the other" (*id*. at p. 1055) which would support the inference that Nguyen recognized the people in that car as rival gang members and pointed them out to the shooter. In the present case, there is no evidence that Valenzuela saw Doe 1 and Doe 2 or that he was the person who made the decision to pull over so his passengers could get out of the vehicle and shoot at them.

Finally, we also note the dissent's reliance on, among the other evidence cited, the gang expert's testimony that "if they [i.e., Norteño gang members] happen to see a rival gang member, they have an opportunity to shoot that gang member *if they have a gun*." (Italics added.) The language we have italicized is crucial to the analysis here because the prosecution presented *no* evidence to support an

12

inference that Valenzuela had a gun himself or knew that either of his passengers were armed that day. The prosecution also presented no evidence that Valenzuela or either of his passengers had a history of engaging in violent acts or shootings, whether against rival Sureño gang members or anyone else. The lack of such evidence is, in our view, fatal to the prosecution's case.

### c. Valenzuela's conduct before the shooting

The Attorney General also contends that Valenzuela's conduct prior to the shooting demonstrates that he shared his passengers' intent to kill the two victims. He argues that Valenzuela "served as the Norteño driver for two armed Norteño passengers … as the trio stalked Sureño territory on Towt Street in search of Sureño targets to extinguish." According to the Attorney General, the fact that Valenzuela "circled the neighborhood for at least 11 minutes" before pulling over "supports the fact that [Valenzuela] was seeking a Sureño target." The Attorney General also notes Valenzuela's efforts to avoid identification by placing his license plate in the glove compartment and instead using black paper plates on the front and back of his vehicle.

Again, the Attorney General presupposes Valenzuela's knowledge that his passengers were armed prior to the shooting and intended to shoot at the Does or other Sureños. It is true that Valenzuela's actions of driving his car through a Sureño "gang area" and pulling over near where John and Jane Doe were standing supports a conclusion that Valenzuela intended to aid and abet *some* form of unlawful engagement with the Does (which could have included but not been limited to assault, robbery, or even murder) by the passengers. Valenzuela's efforts to make his vehicle less identifiable are also consistent with an intent to engage in such unlawful activity. However, without evidence of Valenzuela's specific intent to kill on this specific occasion that is reasonable, credible, or of solid value, it would only be speculative to infer that he shared his passengers' intent to kill when they attacked the Does.

### d. Valenzuela's conduct after the shooting

The Attorney General also points to Valenzuela's conduct after the shooting as further evidence of his intent to kill. After his passengers returned to the vehicle, Valenzuela rolled through a stop sign

13

and, when a police car started following him, he began driving evasively, driving on the wrong side of the road and attempting to hide in a cul-de-sac.

"It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, *including flight*, are relevant to determining whether a defendant aided and abetted in the commission of the crime. [Citations.]" (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599, italics added.) However, "[m]ere presence at the scene of a crime is not sufficient to constitute aiding and abetting." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530.)

We agree that this evidence demonstrates that Valenzuela intended to evade the police *after* the shooting, and that his flight could support a conclusion that he was conscious of his guilt. Again though, there is no evidence that Valenzuela knew his passengers were armed with firearms at any point prior to the shootings and shared their intent to kill the Does *prior to or at the time of the shooting*. Consequently, such flight only lends to speculation and conjecture as to whether Valenzuela harbored an intent to kill the Does.

Again, we appreciate that our role as the reviewing court is limited after the trial court has conducted an evidentiary hearing. Specifically, we must presume on appeal "the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*Clark*, *supra*, 63 Cal.4th at 610.) But an inference " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.) After careful review of the record, we conclude there is no substantial evidence—that is, no evidence that is reasonable, credible, and of solid value—to support the trial court's conclusion that, though not one of the shooters, Valenzuela shared the shooters' "intent … to commit either an attempted murder or a murder."

### B. Resentencing options on remand

Following oral argument, we requested supplemental briefing on the trial court's resentencing options, assuming we were to reverse and remand the matter. Having determined that the trial court's order denying Valenzuela's section 1172.6 petition must be reversed, we next discuss those options.

14

### 1. *Applicable legal principles*

Pursuant to section 1172.6, subdivision (d)(3), "If the prosecution fails to sustain its burden of proof [at the evidentiary hearing], the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." Section 1172.6, subdivision (e) provides: "The petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and the target offense was not charged." In *People v. Arellano* (2024) 16 Cal.5th 457, 463–464, 469–470 (*Arellano*), the California Supreme Court analyzed these subdivisions in the context of deciding whether the resentencing court may add an offense-specific sentencing enhancement or allegation to the redesignated conviction. The Supreme Court explained the language of subdivision (d)(3) directing the court to resentence the petitioner "on the 'remaining charges,' " referred "only to the charges that remain—not charges that *could have been* established by the evidence." (*Arellano*, at p. 470.)

The court next examined the language in subdivision (e) of section 1172.6, which applies when murder or attempted murder was charged generically and there has not been a finding on the target offense or underlying felony.[12] "[T]he 'target offense or underlying felony' under section 1172.6, subdivision (e) is the offense or felony that was the predicate for relief in the first place—i.e., the offense or felony that supported the prosecution's theory of felony murder, murder under the natural and probable consequences doctrine, or any other theory in which malice is imputed based solely on that person's participation in a crime." (*Arellano*, *supra*, 16 Cal.5th at pp. 474–475.)

The Supreme Court concluded that, under subdivision (e), "the underlying felony or target offense 'was not charged' " if "the defendant was neither convicted of the underlying felony or target

---

[12] The court noted that the terms "target offense" and "underlying felony" are not defined in section 1172.6 but recognized that the meanings of both are clear. (*Arellano*, *supra*, 16 Cal.5th at p. 470.) "An 'underlying felony' refers to the felony underlying a felony-murder theory (§ 1172.6, subd. (e); see *People v. Cavitt* (2004) 33 Cal.4th 187, 193 [14 Cal. Rptr. 3d 281, 91 P.3d 222]), and the 'target offense' refers to the offense the natural and probable consequence of which was murder (§ 1172.6, subd. (e); see *People v. Medina* (2009) 46 Cal.4th 913, 920 [95 Cal. Rptr. 3d 202, 209 P.3d 105])." (*Arellano*, *supra*, 16 Cal.5th at p. 470.)

offense nor was either crime actually litigated." (*Arellano*, *supra*, 16 Cal.5th at p. 474, fn. 5.) Thus, under section 1172.6, subdivision (e), where the murder or attempted murder offense was charged generically and the underlying felony or target offense was not charged nor litigated, the trial court redesignates the murder or attempted murder conviction to " 'the target offense or underlying felony for resentencing purposes.' " (*Arellano*, at p. 470.)

Pursuant to *Arellano*, when resentencing under section 1172.6, a court lacks "the separate authority to search out and impose sentence allegations and enhancements that were not charged and proven at trial" because an enhancement is not part of an underlying felony or target offense. (*Arellano, supra*, 16 Cal.5th at p. 474.) However, the Supreme Court left open "whether a court has discretion under section 1172.6, subdivision (e) to redesignate a murder conviction as multiple underlying felonies or target offenses or whether a court must redesignate an underlying offense in any particular degree" because those questions were not before it. (*Id.* at p. 474.)

### 2. Analysis

In this case, Valenzuela's attempted murder was charged generically and he was not convicted of the target offense nor was the target offense litigated below. The parties agree, and we concur, that the trial court is therefore governed by section 1172.6, subdivision (e) in redesignating Valenzuela's attempted murder conviction on remand.

Section 1172.6, subdivision (e) does not specify how a court determines what the target offense is when it redesignates a murder or attempted murder conviction. Nevertheless, the parties agree, as do we, that the trial court has some degree of flexibility in this process. (See *People v. Watson* (2021) 64 Cal.App.5th 474, 488 ["reading section 1170.95, subdivisions (d)(3) and (e) together reflects a legislative intent to grant trial courts flexibility in designating the underlying offense for resentencing purposes."].) The trial court is free to fashion whatever sentence legally complies with the Legislature's declared goal in enacting Senate Bill No. 1437: to uphold "a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability." (Stats. 2018, ch. 1015, § 1, subd. (d).)

16

The parties further agree that, under *Arellano*, the trial court may not impose unproven or uncharged sentence enhancements or allegations when resentencing Valenzuela because an enhancement is not part of an underlying felony or target offense. (*Arellano, supra*, 16 Cal.5th at p. 474.) Again, we concur but express no opinion on whether, as the Attorney General argues, the trial court may or should reimpose punishment based on the gang enhancement that Valenzuela admitted in connection with his plea agreement. On remand, the parties will be allowed to argue this issue in the first instance.

Finally, the Attorney General concedes that section 1172.6, subdivision (d)(1) prohibits the trial court from imposing a sentence greater than Valenzuela's original sentence of 17 years. We agree. The defendant may be resentenced, "provided that the new sentence … is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).

In his supplemental briefing, Valenzuela acknowledges that it is not clear what limits apply to the trial court in resentencing him under section 1172.6, subdivision (e), such as: 1) whether the court may redesignate his sole conviction for attempted murder as more than one target offense or lesser offenses, or 2) whether Valenzuela is entitled to the benefit of any ameliorative changes to the law of sentencing on remand. Again, the parties will be allowed to make such arguments in the trial court in the first instance and we do not intend to suggest how the trial court should rule on such questions.

## III. DISPOSITION

The order denying Valenzuela's Penal Code section 1172.6 petition is reversed and the matter is remanded to the trial court with directions to vacate Valenzuela's attempted murder conviction and to resentence him in accordance with Penal Code section 1172.6, subdivision (e).

17

_____
WILSON, J.

I CONCUR:

_____
GREENWOOD, P. J.

*The People v. Valenzuela*
H050501

BAMATTRE-MANOUKIAN, J., Dissenting.

A trial court's denial of a Penal Code section 1172.6[1] petition following an evidentiary hearing is reviewed for substantial evidence.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)  "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.]"  (*Ibid.*)  " 'Substantial evidence' has been characterized as a 'deferential' standard.  [Citation.]"  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted.)  " 'It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence.'  [Citation.]  'Given this court's limited role on appeal, defendant bears an enormous burden in claiming there was insufficient evidence . . . .  If the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves.'  [Citation.]"  (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 129–130.)  As the majority notes, we must presume in support of the judgment "the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial."  (*People v. Clark* (2016) 63 Cal.4th 522, 610.)  However, " '[a] reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork; a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence.' "  (*People v. Grant* (2020) 57 Cal.App.5th 323, 330.)

Applying this deferential standard of review, the trial court could reasonably conclude based on the evidence presented that Valenzuela shared the intent to kill of the

[1] Further statutory references are to the Penal Code.

actual shooters in this matter. Accordingly, the trial court did not err in denying Valenzuela's petition.

The majority concludes that "without evidence of Valenzuela's specific intent to kill on this specific occasion that is reasonable, credible, or of solid value, it would only be speculative to infer that he shared his passengers' intent to kill when they attacked the Does." (Maj. opn., *ante*, at p. 13.)

Based on the following evidence introduced at the evidentiary hearing, I conclude that the trial court's finding that Valenzuela intended to kill is not based on speculation, but rather is a reasonable inference drawn from circumstantial evidence:

(1) A gang expert opined at the preliminary hearing that Valenzuela and one of the shooters—Jimenez—were active Norteño gang members, that Norteño-Sureño feuds often result in shootings, and that "taking out a rival gang member obviously makes the Norteño gang stronger." The gang expert also testified that "[f]irearms are kind of a tool of the trade for gang members," and that "if they happen to see a rival gang member, they have an opportunity to shoot that gang member if they have a gun."

(2) Valenzuela drove Jiminez and the other shooter into a "Sureño gang area" where he passed by the victims' residence, ran a stop sign, and then circled the neighborhood before pulling over close to the victims' residence to let the shooters out of the car, as shown by video footage.

(3) Valenzuela remained in the car while the shooters got out of the car and approached the victims on foot before pulling out their guns and shooting at them multiple times.

(4) A witness saw Valenzuela park his car, saw one or two people leave the car, and heard gunshots "a few seconds" later, before the person or people returned to the car and the car left.

(5) After leaving the scene with the shooters in the car, Valenzuela drove recklessly, evading officers until he was stopped with the shooters still in the car. His

2

car's license plate had been removed and placed in the glove compartment, replaced with paper "black dealer plates."

Based on this evidence, the trial court could reasonably conclude that Valenzuela directly aided and abetted the attempted murder, a theory of murder unaffected by recent legislative changes to murder law. " 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) All three of these factors support a finding that Valenzuela directly aided and abetted the attempted murders. The evidence shows that Valenzuela drove the shooters to a location near the scene of the shootings, as the witness reported that she heard shots "within a few seconds" of the shooters exiting Valenzuela's car. Valenzuela shared gang membership with at least one of the shooters (Jimenez), he ran a stop sign and circled the victim's residence in a Sureño gang neighborhood, he dropped the shooters off near the residence, he remained in the car during the shootings, and then he evasively drove the shooters away from the scene of the crime. In addition, the evidence demonstrates that the license plates had been removed from Valenzuela's car. Valenzuela's presence at the scene of the crime, his companionship with the shooters, and his conduct before and after the offense all support a conclusion that he directly aided and abetted the attempted murder.

The majority acknowledges that Valenzuela's actions support a conclusion that he intended to aid and abet some form of unlawful activity, but states that it would be speculative to infer that he acted with intent to kill. (Maj. opn., *ante*, at p. 13.) No such speculation is required; rather, the trial court's conclusion was a reasonable inference drawn from the evidence. The relevant question is not whether this court believes that the evidence ruled out all possibilities short of an intent to kill; the relevant question is whether, viewing the evidence in the light most favorable to the judgment, a reasonable

3

trier of fact could find that Valenzuela directly aided and abetted the shooters. "Appellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced of the defendant's guilt . . . .' [Citation.]" (*Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.) Here, the trial court sitting as the trier of fact was presented with circumstantial evidence of Valenzuela's intent. It concluded that this evidence demonstrated Valenzuela's intent to kill. This ruling must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Ibid.*)

*Nguyen* reinforces the conclusion that substantial evidence supports the trial court's ruling in the case before us. Nguyen was a passenger in the back seat of a car driven by a young woman, with a man sitting in the front passenger seat. (*Nguyen*, *supra*, 61 Cal.4th at p. 1053.) The car started following another car, which carried several members of the rival "Cheap Boys" gang. (*Ibid.*) The car Nguyen was riding in passed the other car, and Nguyen and the other passengers "stared back at the car." (*Ibid.*) Later, the car in which Nguyen was riding followed the other car for several blocks until they stopped next to each other at a light. (*Ibid.*) When the traffic signal turned green, the man in the front passenger seat of the car in which Nguyen was riding shot the driver of the other car before the car in which Nguyen was riding drove away. (*Id.* at pp. 1053–1054.) A few days later, Nguyen went to the apartment of another Cheap Boys member who had been in the other car and asked, " 'What's up with the cops?' " (*Id.* at p. 1054.) A gang expert testified that Asian gang members tended to " 'go from place to place around the community hunting for their rivals.' " (*Ibid.*) The gang expert testified that a gang member sitting in the back seat would be expected to serve as a lookout and back

4

the others up if something happened.  (*Ibid.*)  The gang expert also testified that the gang with which Nguyen was affiliated (the "Nip Family") and the Cheap Boys "were in a state of war, and members of both gangs were expected to be able to engage in gunfights with their rivals 'at a moment's notice.' "  (*Ibid.*)

Based on these facts, the California Supreme Court concluded that substantial evidence supported Nguyen's conviction of aiding and abetting attempted murder, which required proof that Nguyen acted with intent to kill.  (*Nguyen*, *supra*, 61 Cal.4th at p. 1056.)  The court in *Nguyen* reasoned:  "Considering this evidence in the context of the ongoing gang war between the Nip Family and Cheap Boys, as well as the Asian gang practices described by [the gang expert], the jury could have inferred that defendant knew of [the shooter's] intent to kill, shared that intent, and aided [the shooter] by spotting potential targets."  (*Id*. at p. 1055.)  The California Supreme Court stated that while gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime, the prosecution gang expert's testimony "strengthened inferences arising from other evidence specific to defendant's role in the crime at issue."  (*Ibid.*)  Our state Supreme Court further stated:  "Although the issue is close, the record here contains substantial evidence from which the jury could have found beyond a reasonable doubt that defendant knew of and shared [the shooter's] intent to kill [the victim] and acted to further the shooting. This evidence was also sufficient to support defendant's related conviction for active participation in a gang."  (*Id.* at p. 1056.)

Here, Valenzuela was the driver of the car, not a mere passenger as in *Nguyen*. The court in *Nguyen* upheld the conviction based on Nguyen's role as a spotter, and Valenzuela's actions of circling the area immediately before the shootings evince a similar or even greater role that he played compared to that of Nguyen.  As in *Nguyen*, the shooting was carried out against a suspected rival gang member, and gang expert testimony tied Valenzuela's role in the shootings to his intent to kill.  The expert testified at the preliminary hearing that he believed Valenzuela was aware on the date of the

5

shootings of the Norteño gang's pattern of criminal activity, that the shooting was carried out to benefit the Norteño gang to which Valenzuela belonged, and that firearms were commonly carried and used in situations such as the instant one. The majority here concludes that no direct evidence showed that Valenzuela was aware of the shooters' plan or was aware of their possession of firearms when they exited the car, but the court in *Nguyen* did not discuss any direct evidence that Nguyen was aware of the shooter's possession of a firearm and nonetheless found that substantial evidence existed that Nguyen aided and abetted the shooting with intent to kill. As in *Nguyen*, considering the evidence in the case before us "in the context of the ongoing gang war," the trier of fact "could have inferred that defendant knew of [the shooters'] intent to kill, shared that intent, and aided [the shooters] by spotting potential targets." (*Nguyen, supra*, 61 Cal.4th at p. 1055.)

That there is no *direct* evidence of Valenzuela's intent prior to or during the shooting itself does not alter the conclusion that Valenzuela shared the intent to kill of the actual shooters. "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. [Citations.]" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) The prosecution's gang expert demonstrated that Valenzuela had a motive to attempt to kill the victims, and "evidence of motive is often probative of intent to kill." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) The testimony by the prosecution's gang expert, Valenzuela's presence at the scene of the crime, Valenzuela's companionship with the shooters, and Valenzuela's conduct before and after the offense all support a conclusion that he directly aided and abetted the attempted murder with the intent to kill.

Recent changes to California murder law, including section 1172.6, were enacted to ensure that each person is "punished for his or her actions according to his or her own level of individual culpability." (Stats. 2018, ch. 1015, § 1, subd. (d).) Valenzuela was no mere "getaway driver" who acted without knowledge of the shooters' plan. Rather,

6

his actions in concealing the car's identity, driving the shooters into a Sureño gang area, spotting the victims while running a stop sign and circling the area, dropping off the shooters a short distance from the site of the shootings, remaining at the scene during the shootings, and recklessly driving them away support the trial court's conclusion that he was a direct aider and abettor of the attempted murder.

Because substantial circumstantial evidence supports the trial court's conclusion that Valenzuela aided and abetted the attempted murder with intent to kill, I respectfully dissent. (See *Reyes*, *supra*, 14 Cal.5th at p. 988.)

BAMATTRE-MANOUKIAN, J.

**People v. Valenzuela**
**H050501**